616 P.2d 902

Arthur J. PASCUCCI, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

Fry's Food Stores, Respondent Employer,

Globe Indemnity Company, c/o Royal Globe Insurance Co., Respondent Carrier.

No. 1 CA–IC 2269.

Court of Appeals of Arizona, Division 1, Department C.

April 17, 1980.

Rehearing Denied June 25, 1980.

Review Denied Sept. 17, 1980.

Ely & Bettini by Joseph M. Bettini, Phoenix, for petitioner.

Calvin Harris, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Glen D. Webster, Jr., Phoenix, for respondent employer and respondent carrier.

## OPINION

OGG, Chief Judge.

In this appeal we must determine if the hearing officer erred in his determination that the petitioner's herniated disc condition was not a new, additional or previously undiscovered condition which warranted a reopening of petitioner's claim.

The petitioner claims that there has been a change in his condition or the discovery of a new undiagnosed condition which occurred after his prior petition for reopening was denied. The respondents claim the petitioner's same lower back problems were litigated in the prior petition to reopen, and that his present petition is barred by the doctrine of res judicata.

The facts are not in dispute. Petitioner suffered an industrial injury on August 25, 1973, when a heavy load of crated lettuce fell from a cart and struck petitioner on the back. The blow was of such force that it caused a double herniation, knocked out some teeth, and injured his back. The injury was accepted for benefits and on December 13, 1976, the claim was closed with an award for temporary disability with no permanent disability.

Petitioner's back pain persisted, he was unable to work, and on May 20, 1977, a petition to reopen was filed. At the hearing, Dr. David Rand, Dr. William Reid, and Dr. Thomas Taber testified that although they observed a defect on the myelogram, it was their opinion such defect was a spondylitic (bony) ridge, and did not indicate a herniated disc. Dr. Bernard Eisenfeld, radiologist, submitted a myelogram report showing his impression that there was a midline disc herniation at the L5–S1 level. Dr. Ranjit Bisla testified that from his examination of the patient and study of the myelograms, it was his opinion that the petitioner had a ruptured disc in the lumbosacral spine.

A Decision Upon Hearing and Findings and Award Denying the Petition to Reopen was issued on February 17, 1978, and thereafter became final.

The petitioner's disabling pain continued and he sought the help of Dr. John Kelley, neurosurgeon, who, after examining him and reviewing the myelogram, determined that petitioner had a protruding disc at the L5–L6 level. Dr. Kelley performed surgery on May 3, 1978, where he visually observed and removed a bulging herniated disc at the L5–L6 level. Based upon Dr. Kelley's findings, the petitioner filed a new petition to reopen on June 13, 1978. The respondent carrier denied the petition by notice of claim status, and the petitioner filed a request for hearing.

At the hearing, Dr. Thomas Taber testified that from the data he had before him at the prior hearing, he had found nothing to indicate a herniated disc. Dr. William Reid testified that the same area of the back was considered at the prior hearing to reopen, and that although he saw a myelographic defect, he believed it was caused by a spondylitic ridge rather than by a herniated disc. He further testified that in attempting to read a myelogram to determine a ruptured disc, "myelograms are notorious for misleading you." Both doctors' testimony indicates the ruptured disc found by Dr. Kelley was new or undiscovered as to them. Dr. Kelley testified that when he operated upon the petitioner, he found no bony ridge defects, and that his visual observation of the herniated disc only confirmed his diagnosis after noting the defect in the myelogram. Dr. Kelley was of the opinion that the herniated disc was directly causally related to the industrial injury, and this opinion was not contested by any medical testimony.

The hearing officer found petitioner had a herniated disc causally related to the industrial accident of August 25, 1973. He further found such condition was not a new, additional or previously undiscovered condition since such condition had been "considered if not known at the time of the prior hearings."

We will now apply the law to the facts to determine if the evidence supports the hearing officer's award denying the claimant's petition to reopen. Workmen's compensation statutes are to be given a liberal interpretation in favor of the employee. *Beasley v. Industrial Commission*, 108 Ariz. 391, 499 P.2d 106 (1972); *Pressley v. Industrial Commission*, 73 Ariz. 22, 236 P.2d 1011 (1951); *Bonnin v. Industrial Commission*, 6 Ariz.App. 317, 432 P.2d 283 (1967). The petition to reopen is brought under the authority of A.R.S. § 23–1061(H) of the Arizona Workmen's Compensation Act. The section provides in part:

> An employee may reopen his claim to secure an increase or rearrangement of compensation or additional benefits by filing with the commission a petition requesting the reopening of his claim upon the basis of *new, additional or previously undiscovered temporary or permanent condition* . . . . (emphasis added)

■ A claimant therefore must establish the existence of one of the three conditions and a causal relation between that condition and the prior industrial injury before the claim can be reopened. *Sneed v. Industrial Commission*, 124 Ariz. 357, 604 P.2d 621 (Ariz.1979).

The legal problem generated in this appeal presents a difficult reasoning problem because there is a basic conflict between strict civil res judicata principles and the reopening provisions of A.R.S. § 23–1061(H). There are no provisions in the civil law to correct prior omissions and update judgments such as are provided for under § 23–1061(H). The facts in this case have also created difficult problems, for here we are dealing with the rather inexact medical science of predicting what permanent disabilities may flow from an injured back.

The respondents rely upon the legal concept stated in *Aetna Insurance Co. v. Industrial Commission*, 115 Ariz. 110, 563 P.2d 909 (App.1977), which held that newly discovered evidence indicating the original award was incorrect is not sufficient to reopen a claim that was previously closed. In *Aetna*, the claimant's doctor testified that his prior diagnosis of a back sprain was in error, and that he now was of the opinion there was a permanent disability.

The petitioner relies upon the legal concept stated in *Garrote v. Industrial Commission*, 121 Ariz. 223, 589 P.2d 466 (App.1978), where the court allowed a reopening when the cause of a previously undiscovered low back problem was eventually determined after the case was closed. In *Garrote*, the court in analyzing the provisions of A.R.S. § 23–1061(H) stated that the "provisions are designed to mitigate the harsh consequences of general res judicata principles which would preclude any reexamination whatsoever of an applicant's claim once it is litigated or closed without protest." *Id.* at 224, 589 P.2d at 467. In our opinion, the facts here more closely resemble the facts in *Garrote* and the facts in the new Arizona Supreme Court case of *Crocker v. Industrial Commission*, 124 Ariz. 566, 606 P.2d 417 (Ariz.1980). In *Crocker*, the claimant in a work–related automobile accident suffered various injuries, including injuries to his feet. The State Compensation Fund closed the case with no permanent disability. At that time, Crocker was still experiencing pain in his right foot but was unable to show medical evidence satisfactory to the hearing officer that there was any organic basis for the pain. The pain persisted and three years later, a new doctor was able to diagnose the exact cause of the pain. In setting aside the award of the Industrial Commission, the *Crocker* court stated that "When a disability in existence at the time of the previous award has not been discovered at the time of the award, the claimant is entitled to a reopening upon discovery by the very terms of A.R.S. § 23–1061(H)." 606 P.2d at 420.

The *Crocker* decision appears to be in harmony with the comments on reopening set out in 3 A. Larson, Law of Workmen's Compensation § 81.31, at 495–96:

> Indeed, it is one of the main advantages of the reopening device that it permits a commission to make the best estimate of disability it can at the time of the original award, although at that moment it may be impossible to predict the extent of future disability, without having to worry about being forever bound by the first appraisal. (footnotes omitted)

In the case before us, the hearing officer at the prior reopening hearing decided to follow the findings of the group of medical experts which found the claimant had no permanent impairment to his lower back. The hearing officer adopted the findings of Drs. Reid, Rand and Taber, but rejected the findings of Dr. Bisla and the myelogram findings of Dr. Eisenfeld. At the hearing on the second petition to reopen, three physicians testified. Drs. Reid and Rand never admitted their prior diagnoses were in error but in substance testified that they were not able to diagnose a herniated disc at the prior hearing. The bottom line of their testimony could only be interpreted to indicate that the herniated disc found in Dr. Kelley's operation was either a new condition or that it was a condition undiscovered by them at the time of the prior hearing. Dr. Kelley did not examine the petitioner until after the award denying the petition to reopen had been entered in the prior petition. When Dr. Kelley operated on petitioner's back and visually observed the herniated disc, it would appear that a new and previously undiscovered condition was positively confirmed for the first time, and that petitioner should be entitled to industrial benefits.

We cannot logically distinguish the facts in this case from the facts in *Garrote* and *Crocker.* In all three cases, the true cause of the worker's physical problems was not definitely known at the time of the prior award finding no permanent disability. In all three cases, later medical diagnosis was able to determine the true cause of the physical disability.

In our opinion, the doctrine of res judicata does not operate to deny an award of benefits under the facts of this case. The award of the Industrial Commission is set aside.

CONTRERAS, P. J., concurs.

JACOBSON, Judge, dissenting:

This is a hard case and from such a case bad law may flow. Given the hearing officer's determinations that the claimant now suffers from a herniated disc and that the herniation is causally connected to his prior industrial injury, an award denying him compensation would appear unjust. However, the principles of *res judicata* are not concerned with the justness of a given result, only with finality. Unless we are prepared to abandon those principles here, this award must be affirmed.

To put this matter in proper perspective, the key evidence involved both in the reopening hearing of 1977 (which resulted in an award denying compensation which became final) and the reopening hearing of 1978 was the interpretation of a myelogram performed by Dr. Eisenfeld on May 12, 1977. This myelogram and its accompanying report were the subjects of direct medical testimony at the first reopening hearing. At that hearing, the score was three to two—Drs. Rand, Reid and Tabor were of the opinion that the defect noted by that myelogram at the L–5,6 level of the petitioner's spine was the result of a spondylitic ridge and was not evidence of a herniated disc; Drs. Eisenfeld and Bisla were of the opinion that this defect represented a herniated disc.

Dr. Bisla's testimony at the first hearing is illustrative of the herniated disc school of thought:

> Q. And what is the purpose of a myelogram?
>
> A. To rule out if there was any ruptured disc in the lower part of the back.
>
> Q. And what did that myelogram reveal?

A. He had a ruptured disc in the lumbosacral spine.

Q. Was that the myelogram performed at approximately May 12, '77, by Dr. Eisenfeld?

A. That is correct.

\*   \*   \*   \*   \*   \*

Q. After you received the results of the myelogram, did that have any significance on your previous findings or previous analysis?

A. Yes, that showed that the patient's primary problem is due to the ruptured disc in the lumbosacral spine which is producing the inflammation which is responsible for the tenderness, pain and limited range of motion.

The spondylitic ridge school of thought is represented by the testimony of Dr. Reid at that same hearing:

Q. Now, at that time do you recall reviewing a myelogram film that had been taken sometime in or about May of '77?

A. Yes, I do.

Q. Do you recall some radiological report that indicated there was a herniated disc?

A. Yes, I recall that.

Q. Now, did you look at that film?

A. Yes, I did.

Q. What was your opinion relative to the findings contained therein?

A. I didn't agree with the report. There is a defect on the myelogram but it is related to a spondylitic ridge at the [L-5/6] interspace. It is a bony defect, not a herniated disc.

The importance of this testimony is that at the first reopening there was placed directly in issue the question of whether the May 12, 1977 myelogram showed that the petitioner suffered a herniated disc which was an industrial responsibility or a bony ridge which was unrelated to the previous industrial injury. The conflict in the medical testimony presented on this issue was resolved against the petitioner. The award containing that resolution was allowed to become final.

The evidence at the first reopening hearing is to be compared with that at the second reopening hearing. Dr. Kelley, who performed surgery on the petitioner and testified that a herniated disc at the L5,6 level was revealed, was questioned concerning the relevancy of the May 12, 1977 myelogram:

Q. And did you arrive at a diagnosis after examining him?

A. Yes. After examining him and reviewing the myelogram, I arrived at the diagnosis of a protruding disc.

Q. At what level?

A. What I chose to call the L-5,6 level.

\*   \*   \*   \*   \*   \*

Q. And did you have a myelographic report to review before arriving at this diagnosis?

A. I believe I did.

Q. Would you give us the date of the myelogram, for the record?

A. The date of the myelogram was 5-12-77.

Q. That's the one by Dr. Eisenfeld?

A. Yes.

Q. Did you take that myelogram into account, as well as your clinical findings, in arriving at the diagnosis of a herniated or protruded disc at L-5,6?

A. Yes.

Q. Did you make any particular recommendations or undertake any particular measures for his care and treatment at that time?

A. I recommended that he have surgery.

At this point, we should pause and analyze this testimony. What Dr. Kelley is saying is that in his opinion, based upon exactly the same evidence that was previously presented to a hearing officer (plus his own observations), the petitioner had a herniated disc. This, of course, is contrary to the conclusions reached by the previous hearing officer based upon the same type of opinion evidence. In the words of *Standard Brands Paint Co. v. Industrial Commission*, 26 Ariz. App. 365, 367, 548 P.2d 1177, 1179 (1976) this:

. . . was no more than additional evidence of a diagnosis of the [claimant's] physical condition which had been presented at the original hearing.

As *Standard Brands Paint Co.* held, this is insufficient to support a finding of a new disability and I do not believe that the majority, based upon this opinion testimony alone, would hold otherwise.

The only thing "new" presented at the second reopening hearing was Dr. Kelley's testimony that, in fact, petitioner did suffer a herniated disc at the L–5,6 level as revealed by visual inspection at the time of surgery. However, this testimony, like Dr. Kelley's opinion testimony, is of the same character—"additional evidence of a diagnosis which had been presented at the original hearing." The only difference between Dr. Kelley's opinion testimony and his factual visual testimony is the probative value to be accorded to it. As correctly concluded by the hearing officer: "The testimony of Dr. Kelley while strong was *merely newly discovered evidence* relating to a condition that had been previously considered." (Emphasis added.)

The majority attempts to avoid this evidentially supported conclusion by characterizing the testimony of Drs. Rand and Reid as indicating "that the herniated disc found in Dr. Kelley's operation was either a new condition or that it was a condition undiscovered by them at the time of the prior hearing." In my opinion, this is a mischaracterization of both doctors' testimony.[1] The "condition" under consideration at both hearings was a *defect* at the L–5,6 level revealed by a myelogram taken on May 12, 1977. The question presented at both hearings was whether that *defect* had its origin in an industrial setting. At the second reopening hearing, both Drs. Rand and Reid testified that they specifically considered the *defect* revealed by the myelogram at L–5,6 level in reaching their prior opinion that this *condition* was not industrially in-

duced. In my opinion, by no stretch of the imagination was the defect at the L–5,6 level a "new or previously undiscovered condition." It was there, it was considered, and it was ruled upon. The simple truth is that Drs. Reid, Rand and Taber were wrong in their diagnosis of petitioner's condition. But that does not make it "new or previously undiscovered," it simply shows that doctors are not infallible.

The majority opinion cites *Crocker v. Industrial Commission*, 124 Ariz. 566, 606 P.2d 417 (Ariz.1980) in support of its conclusion that the diagnosis of petitioner's herniated disc is a new or previously undiscovered condition. I must admit that *Crocker* does cause me pause as it appears to equate "previously undiscovered" with diagnostic capability, a concept I thought was rejected, in the absence of a change of physical condition, by *Aetna Insurance Co. v. Industrial Commission*, 115 Ariz. 110, 563 P.2d 909 (App.1977), *rev. denied*. *Crocker* does not overrule *Aetna* but attempts to distinguish it. Be that as it may, in *Crocker*, the reason for the claimant's condition (pain) had been undiagnosed at the time of the original closing. As stated in *Crocker* (and in the abstract I agree):

When a disability in existence at the time of the previous award has not been discovered at the time of the award, the claimant is entitled to a reopening upon discovery by the very terms of A.R.S. § 23–1061(H).

124 Ariz. at 566, 606 P.2d at 420.

In this case, petitioner's condition had been diagnosed at the time of the original closing (albeit incorrectly) and the "disability" (defect at L–5,6) fully considered. Under these circumstances, *Crocker* is distinguishable.

To use the words of the majority, "the bottom line" of their holding is that if a claimant is able to show that a prior award of the Commission which has become final is wrong, then that claimant is entitled to

---

1. In fact, a close reading of Dr. Reid's testimony reveals that he is still not convinced that petitioner suffered from a "true herniation," that is, a disc protrusion sufficient to involve the nerves in the spine. Given the admitted slow recovery by the petitioner following surgery, this opinion may have some validity.

**448**

reopen. If this be the principle of law established here, I await with some misgivings a carrier's petition to rearrange a claimant's previously established permanent disability award, not on the basis of any changed physical condition, but simply on the grounds that the carrier can now prove the prior award was incorrect. This ruling may afford some present consolation to the petitioner here, but I view the future with trepidation.

I would affirm this award on the basis of *res judicata.* *Black v. Industrial Commission,* 89 Ariz. 273, 361 P.2d 402 (1961); *Terrell v. Industrial Commission,* 24 Ariz.App. 389, 539 P.2d 193 (1975).