617 P.2d 44

**Ralph BELL, Petitioner Employee,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Maricopa County Board of Supervisors, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 2215.**

Court of Appeals of Arizona, Division 1, Department C.

Sept. 25, 1980.

Rehearing Denied Nov. 7, 1980.
Review Denied Dec. 2, 1980.

Spencer K. Johnston, Phoenix, for petitioner employee.

Calvin Harris, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Jones, Teilborg, Sanders, Haga & Parks, P. C. by Gregory L. Folger, Phoenix, for respondents employer and carrier.

OPINION

OGG, Chief Judge.

The question presented in this Special Action–Industrial Commission review is

whether the petitioner's attempt to reopen his workmen's compensation claim is barred by the *res judicata* effect of decisions in prior proceedings before the Industrial Commission.

The history of the claim is as follows. In August 1971, the petitioner, a deputy sheriff, sustained a serious employment related injury when he was shot in the head. Dr. Hal Pittman, neurosurgeon, successfully performed brain surgery to remove the bullet from the right temporal lobe. The bullet fragmented on impact and several small fragments had to be left in the brain tissue. Brain damage was observed during the surgery.

Approximately two months after surgery, the petitioner returned to light clerical duties. As a result of the injury, he suffered a permanent loss of smell and partial sensory loss to the right side of his face. After returning to work, he developed psychiatric symptoms, including depression, irritability, nervousness and emotional lability (difficulty in controlling abrupt emotional changes). He also first reported temporary blackouts. Dr. Pittman referred him to a psychiatrist, Paul Bybee, M.D., who diagnosed post-traumatic brain syndrome. Following brief treatment in psychotherapy, Dr. Bybee released petitioner because he thought petitioner had gained considerable control over these symptoms.

In June 1975, the respondent carrier issued a notice of claim status terminating medical and temporary compensation benefits and denying permanent compensation because the injury resulted in no permanent disability. Petitioner did not protest this notice and it became final.

Subsequent to this notice, petitioner's temporary blackouts recurred, accompanied by outbursts of rage. Diagnostic tests taken during this period, an electroencephalogram and a cranial tomography, showed abnormalities in the region of the bullet wound. Woodson C. Young, M.D., who examined petitioner, advised him that although his problems might be strictly psychological, "there is always a possibility that some scar tissue from . . . [the] old injury might be giving . . . [you] some difficulties." T. Scott Idzorek, M.D., a psychiatrist to whom Dr. Young referred petitioner, hypothesized that the blackouts and rage episodes were "an atypical type of psychomotor seizure disorder" that may be causally related in part to the head injury and surgery. Dr. Idzorek recommended treatment on a trial basis with mysoline, an anti-convulsive drug. He was uncertain as to the etiology and made only a tentative diagnosis. Dr. Pittman doubted this diagnosis but began experimentally to treat petitioner with mysoline.

In June 1976, petitioner *in propria persona* petitioned to reopen his claim, alleging that "[d]ue to build up of scar tissue on the brain I have been having blackouts and seizures." The respondent carrier by notice of claim status denied the petition because of "[i]nsufficient evidence to establish new, additional or previously undiscovered disability causally related to the claim petitioned to be reopened." At this time, it appears there was no positive evidence as to the etiology. Dr. Pittman in his report of June 14, 1976 stated: "At the time of this dictation, it is the examiner's opinion that it is unlikely that the previous bullet injury to the brain is the cause of the episodes described above by the patient, even though the patient does report some focal disturbance on his electroencephalogram." Dr. Pittman's uncertainty as to petitioner's condition is further emphasized in his progress notes of June 15, 1976, wherein he stated that "It is felt that the patient does need additional diagnostic studies including CT scan and probably isotope scan and certainly skull x-ray." Petitioner failed to protest the notice of claim status and it became final.

The mysoline treatment apparently helped petitioner control his condition until the early part of 1978 when he had to discontinue use of the drug because of adverse side effects. The blackouts and rage episodes recurred and after treatment with a new drug, it appears they were again under temporary control.

In May 1978, petitioner submitted a second petition to reopen alleging "[p]ermanent loss of ability to smell and loss of 50% ability to taste, loss of partial feeling in my face. Permanent brain damage. Episodes of rage, nervousness due to brain damage." The respondent carrier denied this petition and petitioner, represented now by counsel, timely requested a hearing.

At that hearing, Dr. Pittman for the first time expressed a definite opinion and found a causal relationship between the rage symptoms and the industrial accident. Dr. Pittman stated that he had to hedge on an opinion at the first hearing in 1976 but that he "viewed things a little differently two years later, and was more willing to ascribe the symptoms, which basically were unchanged, to the brain injury which we know he had."

Although Dr. Idzorek had made a tentative diagnosis of "psychomotor seizures" in 1976, it was Dr. Charles L. Echols, neurologist, who for the first time made a definite diagnosis that the petitioner "is suffering from a psychomotor seizure disorder secondary to the right temporal lobe missile injury from the 19th of August, 1971." Dr. Echols also testified that petitioner had the condition of emotional lability secondary to his head injury.

Dr. Paul Bybee, psychiatrist, when asked about the causal connection between the head injury and the psychomotor seizures, answered: "To my knowledge, he did not have that particular condition when I saw him in '73. That is certainly something that could very well develop what with scarring and so forth several years after an injury of the type he sustained."

The administrative law judge determined that these opinions failed to support the second petition to reopen because of the *res judicata* effect of the unprotested denial of the first petition to reopen. The carrier and the administrative law judge relied upon the legal principle that an industrial award cannot be reopened simply on the basis of newly discovered evidence of a previously known condition where coverage was denied by a prior award. *Black v.*

*Industrial Commission,* 89 Ariz. 273, 361 P.2d 402 (1961); *Aetna Ins. Co. v. Industrial Commission,* 115 Ariz. 110, 563 P.2d 909 (App.1977); *Standard Brands Paint Co. v. Industrial Commission,* 26 Ariz.App. 365, 548 P.2d 1177 (1976). The decision to deny the petition to reopen was also based on the legal concept that a petitioner must show a change in his condition between the first and second petition to reopen. *Phoenix Cotton Pickery v. Industrial Commission,* 120 Ariz. 137, 584 P.2d 601 (1978). The carrier in the answering brief also relied upon the recent case of *Smitty's Super Value, Inc. v. Industrial Commission,* 126 Ariz. 377, 616 P.2d 52 (1980). The carrier stated that "It is the position of the State Compensation Fund that the matter herein is directly on point with *Smitty's Super Value, Inc.*" It should be noted that the Arizona Supreme Court took review and vacated the *Smitty's Super Value, Inc.* opinion. No. 14732 (filed July 18, 1980).

The petitioner argues that this petition to reopen was properly instituted under the authority of A.R.S. § 23–1061(H) of the Arizona Workmen's Compensation Act. The section provides in part:

An employee may reopen his claim to secure an increase or rearrangement of compensation or additional benefits by filing with the commission a petition requesting the reopening of his claim upon the basis of *new, additional or previously undiscovered temporary or permanent condition* . . . . (emphasis added)

Petitioner argues that the hearing on the 1978 petition to reopen clearly indicates that he does have a new, additional and previously undiscovered condition. Dr. Pittman for the first time in 1978 found a causal relationship between petitioner's rage symptoms and the industrial accident. Dr. Echols, for the first time, made a definite diagnosis of psychomotor seizures. Although petitioner's physical and mental problems had manifested themselves soon after the shooting incident and were known at the 1976 petition to reopen, there was no definite medical testimony causally relating the rage episodes to the industrial injury

and no definite medical evidence diagnosing the psychomotor seizures until the second petition to reopen in 1978. In 1976, neither Dr. Pittman nor Dr. Idzorek could make a definite diagnosis or definitely causally relate the petitioner's conditions to the industrial accident. The 1976 petition to reopen was denied because there was a lack of evidence to support a reopening.

We recently dealt with a similar case in *Pascucci v. Industrial Commission*, 126 Ariz. 442, 616 P.2d 902 (1980), Review Granted (S.Ct. No. 14968). The present case is a difficult one in a field of law where there is a division of opinion in this court. See *Id.*, Jacobson dissenting. In our opinion the disposition of this case is controlled by *Pascucci* and the other recent cases of *Crocker v. Industrial Commission*, 124 Ariz. 566, 606 P.2d 417 (1980), and *Garrote v. Industrial Commission*, 121 Ariz. 223, 589 P.2d 466 (App.1978). In all of these cases, the true cause of the worker's physical or mental problems was not definitely known at the time of the prior award finding no permanent disability. In *Crocker*, the claimant in a workrelated accident suffered various injuries, including injuries to his feet. At that time, Crocker was still experiencing pain but was unable to produce satisfactory medical evidence that there was any organic basis for the pain. The pain persisted, and three years later a new doctor was able to make the first definite diagnosis of the cause of the pain. In setting aside the denial of the petition to reopen, the *Crocker* court stated that "When a disability in existence at the time of the previous award has not been discovered at the time of the award, the claimant is entitled to a reopening upon discovery by the very terms of A.R.S. § 23–1061(H)." 124 Ariz. at 569, 606 P.2d at 420. In the case before us the petitioner, like the petitioner in *Crocker*, had experienced problems shortly after the industrial accident, but it was not until the second petition to reopen in 1978 that doctors were able to give a definite medical diagnosis of his problems and relate his problems directly to the industrial accident. Unlike *Aetna* and the line of cases relied upon by the carrier, this case did not involve a changed opinion but rather an evolution of opinion from a tentative to a definite form. As Dr. Pittman's testimony emphasizes, it takes time to observe a patient with a brain injury to intelligently determine if his problems relate to his pre–injury personality or are caused by the industrial accident.

It appears the administrative law judge erroneously failed to consider the new testimony at the second petition to reopen in 1978 on the grounds that the doctrine of *res judicata* barred any further consideration of the case.

For the reasons stated herein, the award is set aside.

DONOFRIO, J., concurs.

JACOBSON, Presiding Judge, dissenting:

In this troublesome area of *res judicata* /reopening of industrial claims, I find myself again in the minority. *See* dissenting opinion in *Pascucci v. Industrial Commission*, 126 Ariz. 442, 616 P.2d 902 (1980). Because this area is in apparent state of flux, another separate dissenting opinion is in order, if for no other reason than to crystallize for others' consideration the principles of workmen's compensation law involved.

In order to do this, a brief capsulizing of the facts are in order.

1. Prior to the closing of petitioner's claim in 1975, the petitioner complained of depression, irritability, nervousness, emotional lability, and reported temporary blackouts. These symptoms were attributed by Dr. Paul Bybee to post–traumatic brain syndrome.

2. Also prior to the closing, petitioner suffered from loss of smell and sensory loss to his face. These losses did not affect his earning capacity and he returned to full time work approximately two months after his surgery.

3. In 1976, the petitioner filed his first petition to reopen his industrial claim, alleging "due to buildup of scar tissue on the brain, I have been having blackouts and

seizures." At this time, he had available to him an electroencephalogram and cranial tomography performed by Dr. Pittman and the tentative diagnosis of Dr. T. Scott Idzorek that petitioner's symptoms of blackouts and rage episodes were due to a psychomotor seizure causally related to the prior industrial head injury and surgery. By notice of claim status, the petition to reopen was denied. Although petitioner employed counsel following the denial, no protest was filed and the denial of the petition to reopen became final.

4. In May, 1978, the second petition to reopen was filed which is the subject of these proceedings. Following a timely denial of this petition and a timely protest, hearings were held.

Initially, it must be pointed out that the unprotested denial of the first petition to reopen constituted a determination on the merits that at that time petitioner had no new, additional, or previously undiscovered condition causally related to his industrial injury. *Phoenix Cotton Pickery v. Industrial Commission*, 120 Ariz. 137, 584 P.2d 601 (App.1978).

Therefore, in order to prevail on the second petition to reopen, the petitioner must comply with A.R.S. § 23–1061(H), which means he has the burden of proving that subsequent to the denial of his first petition to reopen, he became afflicted with a "new, additional or previously undiscovered temporary or permanent condition." In order to sustain that burden, petitioner relies upon the testimony of two doctors: his treating physician, Dr. Pittman, and an expert who testified for the first time in these proceedings, Dr. Charles E. Echols. Dr. Echols is of the opinion that the psychomotor seizures (blackouts) and the emotional lability (rage) are causally related to his industrial head injury. Dr. Pittman, while entertaining doubts as to the causal relationship between the head injury and the psychomotor seizure disorder, now, for the first time is of the opinion that there is a causal connection between the injury and petitioner's emotional lability.

It should first be noted that the conditions for which petitioner now seeks reopening (rage and blackouts) are exactly the same conditions on which petitioner sought reopening in 1976 and were probably present at the time this matter was originally closed in 1975. It should also be noted that no additional diasgnostic tests have been performed upon the petitioner since the first petition to reopen was filed.

Thus, what the hearing officer had before him was Dr. Echols' opinion which was simply a reinterpretation of the same diagnostic information that was available in 1976 and the testimony of Dr. Pittman who previously held no causal opinion, but now, merely through the passage of time, is willing to make a causal connection. As Dr. Pittman frankly admitted:

It was not that I changed my opinion; it is just that I viewed things a little more differently two years later, and was more willing to ascribe the symptoms, *which basically were unchanged*, to the brain injury, which we know he had.

(Emphasis added.)

Based upon this state of the record, the administrative law judge found that petitioner had failed to establish that he now suffers from a new, additional, or previously undiscovered condition.

The administrative law judge was on sound footing in making this determination. There is simply no doubt that the conditions causing petitioner's problems (rage and blackouts) are not new, not additional and are not previously undiscovered—the petitioner had experienced these conditions prior to the original closing in 1975.

The only thing now even alleged to be "new" is the medical opinions causally relating these conditions to the industrial injury. Sound legal authority exists for rejecting the proposition that this type of evidence constitutes grounds for reopening under A.R.S § 23–1061(H).

Dr. Echols' testimony clearly falls within the doctrine enunciated in *Standard Brands Paint Co. v. Industrial Commission*, 26 Ariz. App. 365, 548 P.2d 1177 (1976). That case held that medical opinions which merely

constitute additional evidence of a diagnosis of claimant's condition which could have been presented at the time of the original hearing, do not constitute sufficient evidence to justify a reopening. In short, a petitioner cannot prevail on a reopening simply by finding a doctor who will now testify that based upon the same medical evidence previously considered, the prior determination was incorrect. Dr. Echols' opinion falls in this category, given the binding effect, on the merits, of the previous denial of the first petition to reopen.

As to Dr. Pittman, as the majority opinion points out, his opinion "did not involve a changed opinion but rather an evolution of opinion from a tentative to a definite form." On this basis, the majority attempts to distinguish *Aetna Insurance Co. v. Industrial Commission*, 115 Ariz. 110, 563 P.2d 909 (App.1977). This evolution might be of significance under *Crocker v. Industrial Commission*, 124 Ariz. 566, 606 P.2d 417 (1980) and *Garrote v. Industrial Commission*, 121 Ariz. 223, 589 P.2d 466 (App. 1978), discussed later in this dissent, if Dr. Pittman's opinion concerning a causal relationship was the only opinion on the subject in existence at the time. It was not. As previously indicated, Dr. Bybee and Dr. Idzorek both held causal connection opinions prior to the denial of petitioner's first petition to reopen. The fact that through the passage of time Dr. Pittman now has the same opinion previously expressed by his colleagues does not make the petitioner's condition "previously undiscovered"; rather, it appears to me, to be simply "new evidence" concerning his known condition. This type of evidence was discussed in *Aetna* and rejected as forming the basis for a petition to reopen.

The majority in reaching the conclusion that previously undiscovered causal relationship testimony alone is sufficient to justify reopening relies upon three cases: *Crocker v. Industrial Commission, supra*; *Garrote v. Industrial Commission, supra*; and *Pascucci v. Industrial Commission*, 126 Ariz. 442, 616 P.2d 902 (1980).

I will deal with *Pascucci* first. In that case, the issue for determination was whether the actual discovery of claimant's herniated disc was sufficient to justify a reopening where the issue of whether he had such a disc or a bony ridge defect had been previously litigated. The majority in *Pascucci* held that actual discovery of the claimant's true condition was sufficient to allow reopening. However, *Pascucci* was concerned with the discovery of claimant's actual *physical condition*, it being tacitly recognized in all of the proceedings that if the claimant suffered from a herniated disc, it was causally connected to his prior industrial injury. Even the majority opinion in *Pascucci* did not go so far as to state that simply medical opinion alone, without the verifying physical evidence of the condition, would be sufficient to allow reopening.

*Crocker v. Industrial Commission, supra*, has been discussed in the majority opinion. However, that discussion failed to point out that in *Crocker* the first diagnosis of not only the causal connection of the claimant's symptoms to his industrial injury, but the actual organic cause of these symptoms occurred at the time of reopening. Here, early in the game, Dr. Bybee diagnosed the petitioner's symptoms as attributable to "post–traumatic brain syndrome." At the time the first petition to reopen was filed, Dr. Idzorek tentatively diagnosed the petitioner as suffering from psychomotor seizures causally related to his industrial head injury. In short, in the present case, unlike *Crocker*, there is no initial absence of medical diagnosis.

*Garrote v. Industrial Commission, supra*, like *Crocker*, (at least according to the majority) dealt with a previously undiagnosed condition. What I have said concerning *Crocker* is equally applicable to *Garrote*.

In summary, the majority is holding that simply an evolution of the treating physician's medical opinion, which is based upon no new medical data and which evolved opinion was held by the physician's medical colleagues prior to a previous denial of a petition to reopen, is sufficient to comply with A.R.S. § 23–1061(H). I know of no

authority which would support that position.

Based upon the foregoing, I would affirm the award.